UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHILDREN'S LEGAL SERVICES, PLLC,

                Plaintiff,                          Case Number 10-13000
                                                      Honorable David M. Lawson

v.

SHOR LEVIN AND DERITA, PC,

                Defendant.
_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION
## TO DISMISS FOR WANT OF PERSONAL JURISDICTION
## OR IMPROPER VENUE OR TO TRANSFER VENUE

On July 30, 2010, plaintiff Children's Legal Services, PLLC, a Michigan law firm, filed the present lawsuit in this Court against defendant Shor, Levin, & DeRita, P.C., a Pennsylvania law firm, alleging breach of a settlement agreement, fraud, promissory estoppel, and unjust enrichment. At the core of the dispute is a marketing plan designed to attract families with children suffering from cerebral palsy and other birth trauma related ailments, and the division of attorney's fees generated by the prosecution of medical malpractice cases involving those victims. The defendant has moved to dismiss on the ground of lack of personal jurisdiction. Alternatively, the defendant would like the case transferred to the Eastern District of Pennsylvania. The plaintiff opposes the motion. The Court heard oral argument on October 12, 2011 and now concludes that the motion should be denied.

### I. Facts

The parties' relationships are tangled, which lends an air of complexity to the facts. Here is the quick version. Some Michigan lawyers devised a marketing plan to locate potential medical malpractice clients who may have birth trauma cases. They advertised under the name of 4MyChild,

and published contact information.  When potential clients called, the cases were screened and referrals were made to law firms around the country.  The law firms paid advertising fees and referral fees in some cases.  The lawyers and their law firms that devised the program filed for bankruptcy, and the plaintiff, Children's Legal Services, PLLC, ("CLS") purchased the assets, including the rights to the 4MyChild program, from the bankruptcy estate.

Defendant Shor, Levin, & DeRita, P.C., ("Shor Levin") was one of the law firms that paid advertising fees and received referrals.  At some point, however, Shor Levin decided to start its own advertising program, which it called 4MyBaby.  CLS believed that the 4MyBaby program infringed the 4MyChild trademark and protested to Shor Levin.  A settlement agreement supposedly was reached, which involved yet another Pennsylvania law firm — Villari, Kusturiss, Brandes & Kline ("Villari Kusturiss") — to whom Shor Levin referred medical malpractice cases and received referral fees.  As part of the alleged settlement agreement, Villari Kusturiss paid over to CLS referral fees it held in escrow to which both Shor Levin and CLS had made a claim.  CLS apparently wanted to find peace between Shor Levin and Villari Kusturiss, because CLS had agreed to indemnify Villari Kusturiss for the legal fees Villari Kusturiss incurred as part of the dispute with Shor Levin.

CLS alleges in the complaint that Shor Levin breached the settlement agreement by filing a subsequent lawsuit against Villari Kusturiss to recover the escrowed funds that were paid over to CLS as part of the settlement agreement.  Shor Levin filed its motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), or in the alternative to dismiss for lack of venue under Rule 12(b)(3) and 28 U.S.C. § 1406(a) or to transfer venue under 28 U.S.C. § 1404(a), alleging that all of the activity in this case, including the alleged settlement agreement, occurred in Pennsylvania, and it

has no contact with Michigan.   CLS disagrees.   To demonstrate Shor Levin's contacts with Michigan, a more extensive discussion of the facts is necessary.   The details follow.

Stern & Associates, another Michigan law firm, was the creator and original holder of the intellectual property rights in the 4MyChild program.   The partners in that law firm were Kenneth Stern and Lawrence Korn, both residents of Michigan.   Those lawyers also were members of another law firm called Korn & Stern, P.C., ("Korn & Stern"), which was a Pennsylvania professional corporation.   Stern also happens to be the founder of CLS, which Stern characterizes as the "successor in interest" to Stern & Associates.   Korn & Stern had no employees except the two members.   All work performed by Korn & Stern was done by Stern & Associates employees in Michigan.

Stern advertised 4MyChild as a program that provided counseling to parents of children with cerebral palsy, Erb's Palsy, and other neurological injuries.   Calls from interested parties who responded to the advertising were fielded in Michigan by employees of Stern & Associates.   If the law firm determined that medical malpractice may have been involved in the injury, then it either handled the case itself, jointly represented the client with an affiliated law firm in nearly every state, or referred the case entirely to an affiliated law firm.

In 2004, Lawrence Korn filed an involuntary chapter 7 bankruptcy petition against Stern & Associates after a disagreement over the value of Korn's share of the law firm after he was unable to practice law due to a disability.   The petition was filed in the Eastern District of Michigan. Although the parties are not clear on this point, it appears that Sterns & Associates already had filed for bankruptcy, because the bankruptcy court consolidated the two cases.   In 2005, CLS purchased the proceeds, rights, and claims of both Stern & Associates and Korn & Stern from the consolidated

-3-

bankruptcy estate.  As part of the purchase, CLS acquired all of the rights, including intellectual property rights, associated with the 4MyChild program.  When the bankruptcy proceedings terminated,  CLS was the owner and operator of the 4MyChild program.

Defendant Shor Levin is a Pennsylvania professional corporation located in Jenkintown, Pennsylvania.  In 1998, Shor Levin and Korn & Stern formed a Pennyslvania partnership called Larry Korn and Associates.  The purpose of the partnership was to offer essentially the same services that 4MyChild offers.  The partnership agreement never mentions 4MyChild by name, but it does describe a similar concept.

The plaintiff alleges that Shor Levin funded the advertising for the 4MyChild program by advancing funds to Korn & Stern in Michigan.  Korn & Stern, however, made all the purchases.  When a prospect called 4MyChild, the call would be answered in Michigan by the Stern & Associates office employees.  Korn & Stern and Stern himself would screen the cases to determine if a viable malpractice case could be filed.  If there was a potentially meritorious suit, the case would be either handled by Korn & Stern or Stern & Associates, or sent to affiliated counsel, including the Michigan law firm of Sommers Schwartz and the Pennsylvania firm of Villari Kusturiss.  If the case yielded fees, Shor Levin would receive a share.

Shor Levin was making substantial advances for the advertising of 4MyChild to the tune of approximately $50,000 per month, and it was interested in the procedures taking place in Michigan.  Jay Shor and Lawrence Levin of Shor Levin took a trip to Detroit in 1998 to find out exactly how the program was being operated in Michigan.  When the trip failed to impress, Shor Levin terminated the relationship with respect to the 4MyChild advertising.

Although the relationship between Shor Levin and the 4MyChild program had ended, there were still pending cases in which Shor Levin claimed a right to fees once completed. Villari Kusturiss was responsible for litigating the remaining cases that had come to Pennsylvania through Shor Levin and the 4MyChild advertising. Shor Levin negotiated referral fees with Villari Kusturiss that were to be paid upon completion of the 4MyChild cases. When a 4MyChild case concluded, the attorney's fee would be paid directly to Villari Kusturiss. From there, if the case had started during the time Shor Levin was paying for the advertising for 4MyChild, Villari Kusturiss would distribute a 20% referral fee each to Korn & Stern and Shor Levin. If the case had started after Shor Levin had stopped paying for advertisements, and Korn & Stern had started paying, Villari Kusturiss would distribute 5% of the attorney's fee to Shor Levin and a 38% fee to Korn & Stern.

At some point in time before all fees had been distributed to Shor Levin from Villari Kusturiss, Shor Levin created and began marketing its own program, which was almost identical to 4MyChild, called 4MyBaby. Korn & Stern and Stern & Associates learned that Shor Levin created 4MyBaby and accused Shor Levin of trademark infringement. Believing that potential infringement damages were accruing to Korn & Stern and Stern & Associates, Korn & Stern informed Villari Kusturiss to stop distributing fees to Shor Levin that were generated from the 4MyChild cases. Korn & Stern informed Villari Kusturiss that the money was to be held in escrow until the issues between the two parties were resolved. Shortly thereafter, and before a resolution was negotiated, the involuntary bankruptcy commenced, and CLS purchased the assets of Stern & Associates and Korn & Stern.

On January 13, 2005, CLS and Shor Levin met in Pennsylvania to settle the dispute that had arisen regarding 4MyChild and 4MyBaby. On that day, the two firms reached an oral agreement,

which was memorialized in an e-mail from Jay Shor.  The specifics of that agreement, however, are unclear.  Shor's e-mail fails to shed much light: it only states: "We just finished meeting with Ken Stern regarding the above mentioned matters.  As you know, Ken Stern proposed a settlement of all issues and I am hereby advising you that those terms and conditions are acceptable."

CLS alleges that on that day Jay Shor admitted that 4MyBaby was infringing on CLS's trademark for 4MyChild.  Further, CLS alleges that during that same meeting, the two parties reached an agreement that Shor Levin would stop its infringing advertisements and agree that it had no claim to the money held in escrow by Villari Kusturiss.  In exchange, CLS agreed that it would not litigate the breach of contract and trademark infringement claims that it purchased from Korn & Stern's bankruptcy estate.

CLS alleges that Shor Levin complied with the agreement in most ways, in that it never filed a claim for the funds held in escrow by Villari Kusturiss, stopped its advertising of 4MyBaby, and never filed suit against CLS to recover the fees CLS received from Villari Kusturiss.  Villari Kusturiss then distributed the escrowed funds to CLS.

On April 5, 2007, Shor Levin filed suit in Pennsylvania state court against Villari Kusturiss for, among other things, distributing money to CLS in violation of Shor Levin's rights.  On July 30, 2010, CLS filed the present lawsuit against Shor Levin alleging claims for breach of contract (Count I), fraudulent misrepresentation (Count II), promissory estoppel (Count III), unjust enrichment (Count IV), and declaratory and injunctive relief (Count V).  CLS alleges that the bankruptcy order approving the asset sale gave them full legal rights to the funds being held in escrow by Villari Kusturiss, and for Villari Kusturiss to distribute those funds to anyone else would have been in violation of the bankruptcy order.  Apparently, pursuant to the purchase agreement approved by the

bankruptcy court, CLS is required to indemnify Villari Kusturiss for any litigation expenses Villari Kusturiss incurs regarding the escrowed funds.  CLS alleges that it has already reimbursed approximately $500,000 to Villari Kusturiss to support its litigation with Shor Levin.  CLS also alleges that Shor Levin's attempt to recover the funds previously held in escrow is a violation of the settlement agreement allegedly made in Pennsylvania on January 13, 2005.

Shor Levin contends in its motion to dismiss or transfer venue that it has no connection to Michigan.  Lawrence Levin insists that the substantial monthly advertising payments Shor Levin made were intended only to be used in an advertising campaign that targeted potential clients in Pennsylvania.  He also says that the only fees Shor Levin received were from cases that were handled in Pennsylvania by Pennsylvania law firms.

Shor Levin also has general advertising through a website called "Bulldog Lawyers," which CLS alleges contains direct advertising toward the State of Michigan.  That does not appear to be true.  The first thing one notices when opening the "Bulldog Lawyers" website is a pop-up screen that states, in its entirety, "Hi . . . You may just be browsing but we are available to answer your questions. Click 'Yes' for live help.  (Please let us know what state you live in as we handle cases in the following states: PA, NJ, DE, SC, MD and IL.)" Def.'s Reply, Ex. D, Print-Out of Pop-Up Window.  The website also carries a slew of National Institute for Occupational Safety and Health (NIOSH) articles.  In an article about hearing loss, the page opens first with a "Michigan's Example," followed by an article pertaining to on-the-job hearing loss in the State of Michigan.  At the end of the article is a link which states, "ASK THE BULLDOG LAWYERS ABOUT YOUR RIGHTS."  *Ibid.*  Several other articles on the website mention the State of Michigan, but not exclusively.  At the bottom of each page is the difficult-to-read legend: "This website is not intended

to solicit clients outside the states of Pennsylvania, New Jersey, Ohio, West Virginia and Arizona." Def.'s Reply, Ex. C, NIOSH Article Print-Outs at 99.

CLS points out that although Korn & Stern was a Pennsylvania law firm, it had no employees of its own, and the advertising money Shor Levin sent to Korn & Stern would be spent at the offices of Stern & Associates. Lawrence Levin acknowledges that the calls received in response to the advertisements were handled in Michigan, and that Korn & Stern set up a forwarding agreement with the Michigan law firm Sommers Schwartz. CLS also contends that Shor Levin received fees from lawsuits gathered by advertising that Shor Levin paid for, which were handled by Stern & Associates and Stern & Associates's Michigan employees, and where the initial steps of the litigation process took place in Michigan.

## II.  Jurisdiction

Defendant Shor Levin insists that it may not be sued in Michigan. It argues that no Michigan court can exercise personal jurisdiction over it. Alternatively, the defendant contends that venue is improper in this Court, and even if proper, venue should be transferred to the Eastern District of Pennsylvania for the convenience of the parties.

"The question of personal jurisdiction, which goes to the court's power to exercise control over the parties, is typically decided in advance of venue, which is primarily a matter of choosing a convenient forum." *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979).

### A.  Personal jurisdiction

In a motion to dismiss for want of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the plaintiff has the burden of proving the court's jurisdiction over the defendant. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002). "[I]n the

-8-

face of a properly supported motion for dismissal, the plaintiff may not stand on his pleadings but

must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction."

*Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).  However,

> [w]here, as here, the district court relies solely on written submissions and affidavits
> to resolve a Rule 12(b)(2) motion, rather than resolving the motion after either an
> evidentiary hearing or limited discovery, the burden on the plaintiff is "relatively
> slight," *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir. 1988), and "the
> plaintiff must make only a *prima facie* showing that personal jurisdiction exists in
> order to defeat dismissal." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir.
> 1991).  In that instance, the pleadings and affidavits submitted must be viewed in a
> light most favorable to the plaintiff, and the district court should not weigh "the
> controverting assertions of the party seeking dismissal." *Id.* at 1459.

*Air Prods. & Controls, Inc. v. Safetech Int'l., Inc.*, 503 F.3d 544, 549 (6th Cir. 2007).  A plaintiff

"can meet this burden by 'establishing with reasonable particularity sufficient contacts between [the

defendant] and the forum state to support jurisdiction.'"  *Neogen*, 282 F.3d at 887 (internal citations

omitted).

In a diversity case, "'[t]he exercise of personal jurisdiction is valid only if it meets both the

state long-arm statute and constitutional due process requirements.'"  *Gerber v. Riordan*, 649 F.3d

514, 517 (6th Cir. 2011) (quoting *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000)).

The Sixth Circuit has explained that "[w]here the state long-arm statute extends to the limits of the

due process clause, the two inquiries are merged and the court need only determine whether

exercising personal jurisdiction violates constitutional due process." *Bridgeport Music, Inc. v. Still

N The Water Publ'g,* 327 F.3d 472, 477 (6th Cir. 2003) (per curiam) (internal citations omitted).

"[T]his Circuit historically has understood Michigan to intend its long-arm statute to extend to the

boundaries of the fourteenth amendment." *Theunissen*, 935 F.2d at 1462; *see also Green v. Wilson,*

455 Mich. 342, 350-51, 565 N.W.2d 813, 816-17 (1997) (stating that "[t]he long-arm statute is

coextensive with due process insofar as the statute is limited by due process, and, therefore, the statute and due process share the same outer boundary" (citing *Sifers v. Horen,* 385 Mich. 195, 188 N.W.2d 623 (1971))). In Michigan, jurisdiction may be asserted over a corporation on the basis of general personal jurisdiction, *see* Mich. Comp. Laws § 600.711, or limited personal jurisdiction, *see* Mich. Comp. Laws § 600.715.

### 1. General personal jurisdiction

General personal jurisdiction exists over any corporation that is incorporated in Michigan, consents to jurisdiction, or engages in continuous and systematic business in Michigan. Mich. Comp. Laws § 600.711. General jurisdiction is consistent with due process when the corporation's relationship with the state is "of a continuous and systematic nature." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 421 (1984) (internal quotations omitted). Sporadic or temporary contacts for a particular purpose are not sufficient to establish general jurisdiction. *Nationwide Mut. Ins. Co. v. Tryg Intern. Ins. Co., Ltd.*, 91 F.3d 790, 794 (6th Cir. 1996); *cf. Landoil Res. Corp. v. Alexander & Alexander Serv., Inc.*, 918 F.2d 1039, 1046 (2nd Cir. 1990) (holding that thirteen business trips made by different employees of defendant over eighteen months was insufficient for general jurisdiction under N.Y. C.P.L.R. 301).

Ths plaintiff contends that the defendant is subject to general jurisdiction because it systematically and continuously conducted business here. However, the defendant never actually was located in the state. In *Storie v. Beech Aircraft Corporation,* 417 F. Supp. 141 (E.D. Mich. 1976), the court held that before general jurisdiction could be exercised over a foreign corporation, the corporation must actually be regularly present in the State, either through someone who works for the corporation or an independent agent of the corporation. 417 F. Supp. at 145; *see also Kircos*

-10-

*v. Lola Cars Ltd.*, 97 Mich. App. 379, 386, 296 N.W.2d 32, 35 (1980) (interpreting section 600.711(3) to require that "[a] foreign corporation . . . actually be present within the forum state on a regular basis, either personally or through an independent agent" (citing *Storie*, 417 F. Supp. at 145)).   Maintaining business contacts in Michigan through telephone communication, but not actually entering the state on a regular basis is not enough to establish continuous and systematic business in Michigan.  *Storie,* 417 F. Supp. at 145.  Nor will a single trip to Michigan approximately 12 years before the present suit suffice.

The plaintiff also argues that the advertising on Shor Levin's website and the advertising Shor Levin funded through the partnership agreement with Korn & Stern are enough to establish general personal jurisdiction.  Once again, however, precedent does not support the argument.  *See Bird v. Parsons,* 289 F.3d 865, 874 (6th Cir. 2002) (holding that maintaining a website that is available to everyone through the Internet is not sufficient to support a finding of general personal jurisdiction).

The Court concludes that the defendant is not subject to general personal jurisdiction in this Court.

### 2.  Limited personal jurisdiction

Limited personal jurisdiction may be exercised over a defendant who has certain minimum contacts with the forum over claims that arise from or relate to those contacts.  *Theunissen*, 935 F.2d at 1459-61.  Under the Michigan statute, limited personal jurisdiction may be exercised over a corporation that has one of the following relationships with the state:

(1) The transaction of any business within the state.
(2) The doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort.

> (3) The ownership, use, or possession of any real or tangible personal property situated within the state.
> (4) Contracting to insure any person, property, or risk located within this state at the time of contracting.
> (5) Entering into a contract for services to be performed or for materials to be furnished in the state by the defendant.

Mich. Comp. Laws § 600.715.  A single contact with the forum state may suffice for personal jurisdiction if it is directly and substantially related to the plaintiff's claim.  *Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1359 (Fed. Cir. 1998).

The plaintiff contends that defendant Shor Levin qualifies as having transacted business in Michigan.  The Sixth Circuit has explained that the "transaction of any business" clause is quite broad:

> [T]he Michigan Supreme Court stated that "[t]he word 'any' means just what it says. It includes 'each' and 'every.' . . . It comprehends the 'slightest.'" *Lanier v. Am. Board of Endodontics*, 843 F.2d 901, 905-06 (6th Cir. 1988) (quoting *Sifers v. Horen*, 385 Mich. 195, 199 n.2, 188 N.W.2d 623, 624 n.2 (1971)).  This construction applies with equal force to section 705. *Hertzberg & Noveck v. Spoon*, 681 F.2d 474, 478 (6th Cir. 1982).

*Theunissen*, 935 F.2d at 1463-64.  A transaction of business includes "contact with Michigan customers through the mail and the wires." *Neogen*, 282 F.3d at 892 (citing *Sifers v. Horen*, 385 Mich. 195, 188 N.W.2d 623 (1971)).  Shor Levin agrees that it has transacted business in Michigan in the past; however, it does not agree that the present suit "arises" out of the contact with Michigan.

The due process requirements parallel to some extent the terms of the statute.  The Sixth Circuit has identified three considerations to determine whether limited personal jurisdiction extends to a defendant in a particular case:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or

consequences must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Gerber v. Riordan*, 649 F.3d 514, 518 (6th Cir. 2011) (internal quotations omitted); *see also Neogen Corp.*, 282 F.3d at 890 (quoting *Southern Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)).

The Sixth Circuit "views the purposeful availment prong of the *Southern Machine* test as 'essential' to a finding of personal jurisdiction." *Intera Corp. v. Henderson*, 428 F.3d 605, 616 (6th Cir. 2005) (citing *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 722 (6th Cir. 2000)). "Purposeful availment" occurs when "the defendant's contacts with the forum state 'proximately result from actions by the defendant himself that create a "substantial connection" with the forum State.'" *Neogen Corp.*, 282 F.3d at 889 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). This requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" *Ibid.* (quoting *Burger King*, 471 U.S. at 475). In that respect, the Sixth Circuit "has found that contacts lack quality when they are initiated by the plaintiff rather than the defendant, in part because '[t]he unilateral activity of those who claim some relationship with a non-resident defendant cannot satisfy the requirement of contact with the forum.'" *Air Products*, 503 F.3d at 552 (quoting *LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1301 (6th Cir. 1989) and *Helicopteros*, 466 U.S. at 417). On the other hand, "parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King*, 471 U.S. at 473 (internal quotation omitted).

-13-

The mere act of entering into a contract with a party in a state is insufficient to establish purposeful availment. *Burger King*, 471 U.S. at 478.  The law is clear that the act of an out-of-state entity contracting with an in-state entity, and undertaking communication related to that contract, does not constitute purposeful availment of the forum state for an action based on the breach of that contract.  Instead, "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Id.* at 479. "The acts of making phone calls and sending facsimiles into the forum, standing alone, may be sufficient to confer jurisdiction on the foreign defendant where the phone calls and faxes form the bases for the action." *Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001) (holding that sending fraudulent communications into a forum state constituted purposeful availment).  Ultimately, though, "[i]t is the quality of the contacts, not the quantity, that determines whether they constitute 'purposeful availment.'" *Ibid.* (citing *LAK, Inc.*, 885 F.2d at 1301).  For again, "telephone calls and letters on which the plaintiff's claim of jurisdiction primarily depends [can also] strike . . . as precisely the sort of 'random,' 'fortuitous' and 'attenuated' contacts that the *Burger King* Court rejected as a basis for haling non-resident defendants into foreign jurisdictions." *LAK,* 885 F.2d at 1301.

The "arising from" prong is satisfied "when the operative facts of the controversy arise from the defendant's contacts with the state." *Calphalon*, 228 F.3d at 723.  The Sixth Circuit has held that personal jurisdiction may exist over a non-resident defendant if the defendant "purposefully directs communications into the forum that cause injury within the forum, and those communications form the 'heart' of the cause of action." *Neal*, 270 F.3d at 333.  However, "'the locus of . . . a monetary

-14-

injury is immaterial, as long as the obligation did not arise from "a privilege the defendant exercised in the forum state."'" *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 151 (6th Cir. 1997) (quoting *LAK*, 885 F.2d at 1301); *but see Neogen*, 282 F.3d at 892 (determining that the plaintiff's allegations of economic harm from trademark infringement were sufficient to support a *prima facie* case for personal jurisdiction).

The court of appeals found the "arising from" component satisfied in *Lanier v. American Board of Endodontics*, 843 F.2d 901, 908-09 (6th Cir. 1988), where a female dentist sued the Illinois-based American Board of Endodontics in federal court in Michigan, alleging that she was denied a license by the Board on the basis of gender. The Board moved to dismiss, arguing that it had insufficient contacts with the State of Michigan. The court of appeals disagreed, finding that the Board had transacted business within Michigan by exchanging correspondence and telephone calls with the plaintiff, and that the plaintiff's cause of action arose out of those business transactions. The court considered two possible theories defining the "arising from" requirement: whether the business transactions "made possible" the cause of action; and whether the cause of action arose in the "wake" of the business transactions. *Id.* at 909. Applying both theories, the court held that the discrimination was made possible and occurred in the wake of the plaintiff's filing of her application, which constituted the transaction of business in Michigan by the Board. *Id.* at 908-09. The court found that the application process, evaluation, testing, and rejection were part of a "mosaic of activity," "every step of which was a constituent part of the whole." *Id.* at 908. The court reasoned that if the defendant discriminated against Dr. Lanier on account of her gender, it "must have done so, based at least in part, upon what it learned about her from its professional business contacts with her in Michigan during the very earliest stages of the application process."

*Id.* at 909.  Because those contacts made possible the rejection and concomitant discrimination, and the cause of action lay in the wake of them, the court found that the claims arose from the contacts with the forum.

If the first two elements are met, an "inference of reasonableness arises . . . [and] only the unusual case will not meet this third criterion."  *Theunissen*, 935 F.2d at 1461 (internal quotations and citations omitted); *see also Intera Corp.*, 428 F.3d at 618.  In the Sixth Circuit, courts also determine the reasonableness of exercising personal jurisdiction over a defendant by weighing several factors, including "(1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the controversy."  *Intera Corp.*, 428 F.3d at 618.  Regular business relationships with a forum, and plans to continue those relationships, can support a finding of reasonableness.  *See Neogen*, 282 F.3d at 892 ("[The defendant] anticipates from year to year that it will conduct a given level of sales in Michigan. . . . Although [the defendant's contacts with] individual customers do not represent 'continuing relationships and obligations' with those particular customers, its predictable yearly business in Michigan does represent such a continuing relationship with the state overall.")

The plaintiff alleges that Shor Levin had contact with Michigan through its Internet advertising, the bilateral communications necessitated by its agreements with Stern & Associates and Sommers Schwartz in the 4MyChild cases that were obtained through advertising paid for by Shor Levin, and the 1998 trip to Michigan.  Shor Levin points out that none of that activity forms the basis of the present lawsuit, which Shor Levin seeks to confine narrowly to the oral settlement agreement negotiated in Pennsylvania.

-16-

However, the settlement agreement itself did not occur in a vacuum. If it was "made possible by" or "lies in the wake of" Shor Levin's contact with Michigan, personal jurisdiction may be appropriately exercised. The Court finds that it does lie in the wake of the well-developed relationship Shor Levin had consummated with the Stern law firms, which operated primarily in Michigan.

In order to understand the mosaic of activity that led to the oral settlement agreement and its alleged breach, one must start with Shor Levin's first contact in Michigan, which was forming a partnership agreement with Korn & Stern. Although Korn & Stern is incorporated in Pennsylvania, Shor Levin acknowledges (or at least never denies) that it knew Korn & Stern was staffed fully by the Michigan employees of Stern & Associates. Next, Shor Levin paid for advertising that was developed by the Michigan employees of Stern & Associates. The content of those advertisements is unclear, but it is clear that the calls generated by the advertisements were answered in Michigan by employees of Stern & Associates or Sommers Schwartz. From those calls, some cases were referred to Shor Levin in Pennsylvania and were later litigated by Villari Kusturiss. When Villari Kusturiss was paid a fee, it gave a share, through one avenue or another, to Shor Levin. Therefore, the fees paid to Villari Kusturiss were "made possible by" the advertising and Michigan employees that Shor Levin was working with. There is a clear path that starts with Shor Levin's contact with Michigan and ends with money in the hands of Villari Kusturiss.

Further, Shor Levin committed an act in Pennsylvania whose effects were felt in Michigan. By starting the 4MyBaby program, Shor Levin allegedly infringed on the trademark of Stern & Associates and caused damage to the 4MyChild program in Michigan. When Korn & Stern and Stern & Associates discovered that activity, they made Villari Kusturiss aware and asked that all

-17-

fees that were destined for Shor Levin arising from the 4MyChild program be sequestered in escrow until the issues between the companies could be resolved. Korn & Stern and Stern & Associates then went through bankruptcy and CLS purchased the assets, including claims against Shor Levin. The bankruptcy process — a Michigan proceeding — generated an order that all money held in escrow by Villari Kusturiss be paid to CLS. Without that order, Villari Kusturiss would never have distributed the money in the escrow account to CLS. If Shor Levin had not infringed the trademark, no settlement agreement would have emerged. And if Villari Kusturiss had never distributed the money to CLS as part of that settlement, then Shor Levin never would have sued Villari Kusturiss. Also, without the bankruptcy order, CLS would never have indemnified Villari Kusturiss from further suit regarding the money in escrow, and the alleged violation of the settlement agreement would have never arisen.

The breach of settlement agreement arose in the wake of the mosaic of activities that lead to the settlement agreement itself. Although the settlement agreement was crafted in Pennsylvania, the activity, which included Shor Levin's partnership with Korn & Stern, involved contact with Michigan when Shor Levin made substantial payments to Korn & Stern in Michigan, interacted with the case-processing personnel there, engaged in business contacts with both Stern & Associates and Sommers Schwartz, and ultimately infringed a trademark belonging to the Michigan entity. The Court finds, therefore, that the present claims "arise from" the defendant's contact with this forum.

For the same reasons, the Court finds that Shor Levin purposely availed itself of the privilege of doing business in Michigan. *See Air Prods.*, 503 F.3d at 550 (holding that a non-Michigan corporation purposefully availed itself of doing business in Michigan by contracting with a company whose principle place of business was in Michigan and by committing tortious conduct that caused

-18-

effects felt in Michigan).  Shor Levin agreed with Korn & Stern to pay advertising fees to Korn & Stern.  Shor Levin has admitted that the advertisements would result in phone calls, and that those phone calls would be answered by Michigan employees of Stern & Associates and Sommers Schwartz.  After those calls were screened, certain cases would be transferred to Pennsylvania and would result in fees to Shor Levin.  The plaintiff has offered a *prima facie* case that Shor Levin had a business relationship with Stern & Associates and Sommers Schwartz in that Shor Levin knew that phone calls arising out of its advertising were being handled by those firms, which are Michigan companies.  And, of course, according to CLS, Shor Levin committed a tortious act which caused effects that were primarily felt in Michigan.

Finally, the Court finds that the defendant's alleged conduct is connected to Michigan sufficiently enough to make the exercise of jurisdiction over it to be reasonable.  As a general rule, "an inference of reasonableness arises where the first two criteria are met and that 'only the unusual case will not meet this third criterion.'" *Theunissen*, 935 F.2d at 1461 (internal citations omitted).  Because the first two prongs of the test have been fulfilled, the plaintiff has the benefit of an "inference of reasonableness." *Ibid.*

The Court concludes, therefore, that it has personal jurisdiction over the defendant to adjudicate the claims in the complaint.

### III.  Venue

The defendant argues that venue does not properly lie in this district.  Under 28 U.S.C. § 1391(b)(1) venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located."  Venue is proper in the Eastern District of Michigan if Shor Levin "resides" in this district.  Under 28 U.S.C. § 1391(c)(2), a corporation is

deemed to reside "in any judicial district in which such defendant is subject to the court's personal jurisdiction." The Court has determined that it has personal jurisdiction over Shor Levin; therefore, the defendant is deemed to reside in this district, and venue is properly laid here.

The defendant has moved to transfer venue under 28 U.S.C. § 1406(a). However, that statute furnishes the defendant no help, because it applies only where "a case [is filed] laying venue *in the wrong division or district*." (emphasis added).

The defendant also asks to transfer the case to the Eastern District of Pennsylvania under 28 U.S.C. § 1404(a) for its convenience. That statute states: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." "[I]n ruling on a motion to transfer under § 1404(a), a district court should consider the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns, such as systemic integrity and fairness, which come under the rubric of 'interests of justice.'" *Moses v. Bus. Card Express, Inc.*, 929 F.2d 1131, 1137 (6th Cir. 1991).

The case certainly could have been filed in the Eastern District of Pennsylvania. However, CLS argues that *it* will be inconvenienced if venue is changed to Pennsylvania. CLS contends that where the factors demonstrate that transferring the case merely would shift the inconvenience from one party to the other, the plaintiff's choice of forum should be honored and transfer should be denied.

In this case, all of the factors seem to weigh about equally between the two parties. CLS's witnesses and evidence are mostly in Michigan, while Shor Levin's evidence and witnesses are in

-20-

Pennsylvania. Pennsylvania has an interest in the suit because it involves one of its corporations and there is already a suit pending in Pennsylvania state court on the collateral matter between Shor Levin and Villari Kusturiss. However, Michigan is also interested in the dispute because CLS, a Michigan company, has been harmed by having to reimburse legal fees to Villari Kusturiss.

In *Nicol v. Koscinski*, 188 F.2d 537 (6th Cir. 1951), the Sixth Circuit held that a plaintiff's choice of forum should rarely be disturbed, and that only a strong showing of inconvenience to a defendant would be enough to necessitate venue transfer. 188 F.2d at 537. The defendant has not made that showing here. Therefore, the motion to transfer venue will be denied.

### IV.  Conclusion

The Court finds that it has personal jurisdiction over the defendant because the plaintiff has established a *prima facie* case that satisfies Michigan's long-arm statute defining limited personal jurisdiction over corporations and the Due Process Clause. The Court also finds that transferring the case out of this district is not appropriate.

Accordingly, it is **ORDERED** that the defendant's motion to dismiss for want of personal jurisdiction or improper venue or to transfer venue [dkt. # 12] is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  March 28, 2012

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 28 2012.

s/Deborah R. Tofil
DEBORAH R. TOFIL

---